IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BRENDA KAY LEE,

               Plaintiff,               CV-08-531-ST

     v.                                OPINION AND ORDER

COUNTRYWIDE HOME LOANS,

               Defendant.

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Brenda Kay Lee ("Lee"), appearing *pro se*, initially filed this action on March 28, 2008, as Case No. 08-2183 in the Circuit Court of the State of Oregon for the County of Clatsop. Defendant, Countrywide Home Loans, Inc. ("CHL"), timely removed that action to this court pursuant to 28 USC § 1441(b). This court has diversity jurisdiction under 28 USC § 1332 because Lee is a citizen of Oregon, CHL is incorporated in New York with its principal place of business in California, and the amount in controversy exceeds $75,000.

Lee alleges four claims arising out of the foreclosure of CHL's mortgage on her former home located in Gearhart, Oregon: (1) breach of contract; (2) breach of implied contract; (3) breach of implied covenant of good faith and fair dealing; and (4) intentional infliction of emotional distress. CHL has filed a motion for summary judgment (docket #23) against all of these claims.

All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

For the reasons set forth below, CHL's motion is granted.

## **LEGAL STANDARD**

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987). The

court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id* (citation omitted).

## UNDISPUTED FACTS

**I.      Loan and Deed of Trust**

In October 2003, Lee obtained a 30-year, fixed interest rate loan from CHL in the amount of $140,400.00 in order to purchase property located at 1324 Wildrose Lane, in Gearhart, Oregon ("Subject Property"). This loan was evidenced by a Promissory Note and secured by a Deed of Trust on the Subject Property.

The Note obligated Lee to pay the debt in monthly payments and also allowed prepayments without penalty. Under the Deed of Trust, any voluntary prepayments or amounts that exceeded the amount due would be applied first to late charges, second to any other amounts due, and then to reduce the principal balance. The Deed of Trust also provided that if a payment or partial payment was insufficient to bring the loan current, CHL could either accept the payment without waiving any of its rights or return the payment to Lee. The Deed of Trust provided that a portion of each month's periodic payment was set aside for the payment of taxes and insurance. Also pursuant to the Deed of Trust, in the event of a breach of any covenant by Lee, CHL must give notice to her specifying:

> (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to the Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. . . . If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law.

Saucedo 12/12/08 Decl., ¶¶ 12, 42 & Ex. 2, ¶ 22.

## II.     First Default and Foreclosure

From December 2003 through the spring of 2005, Lee made timely and regular mortgage payments which kept her account current through June 2005. Then, according to CHL's records, Lee defaulted on the terms and conditions of her loan by failing to make her July and August 2005 mortgage payments. As a result, on August 16, 2005, CHL sent Lee a Notice of Default and Acceleration, which advised Lee that she had not submitted her July and August 2005 payments. On September 16, 2005, CHL again sent a Notice of Default and Acceleration to Lee, advising that she had not submitted her August and September 2005 payments.

CHL received two payments from Lee on or about September 14 and October 6, 2005, which it credited as the July and August 2005 payments. Since the loan continued to remain delinquent according to CHL's records, CHL sent Lee another Notice of Default and Acceleration on October 17, 2005, which advised that she had not submitted her September and October 2005 payments.

Although Lee attempted to make another payment in late December 2005 or early January 2006, CHL deemed the amount insufficient to bring current the delinquent account and returned Lee's check. In February 2006, CHL issued a Notice of Default and Election to Sell due to delinquency and default, setting a sale date of June 21, 2006.

In March 2006, CHL received documents from Lee purporting to show that she had not missed loan payments. After reviewing these documents, CHL determined that its records were correct and Lee was delinquent. However, CHL still worked with Lee throughout the remainder of 2006 to research and analyze her payments. Lee contended that she had made

all of her payments and possessed supporting documentation, but she failed to send those documents to CHL.

Although Lee attempted to make a payment in April 2006, CHL deemed her to have been in arrears for at least seven months and returned her check as insufficient to cure the default.

### III.     Loan Modification

In June 2006, CHL worked with Lee to create a loan modification that was feasible for her.  Due to Lee's failure to timely return the loan modification documents, CHL postponed the scheduled foreclosure sale at least six times throughout the summer, fall, and early winter of 2006.

Lee finally signed the Loan Modification Agreement in December 2006.  Pursuant to that agreement, Lee agreed to pay the delinquent amounts on the loan, capitalized over the life of the loan, and CHL agreed to cancel foreclosure proceedings.  The terms of the Note and Deed of Trust were incorporated into the Loan Modification Agreement.  After the loan modification, Lee's new mortgage payment was $1,124.08, of which $903.17 was allocated to principal and interest and the remainder was placed in escrow to pay taxes and insurance.  The parties also agreed that the terms of the Note and Deed of Trust would remain in force.

### IV.     Second Default and Foreclosure

According to CHL's records, Lee attempted to make the payment due January 1, 2007, with a check dated January 28, 2007, in the amount of $850.00.  CHL credited that payment as a partial payment.  Thereafter, according to CHL's records, Lee made no further mortgage payments.

On April 23, 2007, CHL sent Lee a Notice of Default and Acceleration based on a failure to submit the February, March, and April 2007 payments. This Notice of Default provided Lee with the opportunity to cure and bring the account current which she did not do.

On September 18, 2007, CHL initiated foreclosure proceedings by issuing a Notice of Default and Election to Sell, setting a sale date of January 24, 2008. The Notice of Default and Election to Sell provided that Lee had the right "at any time prior to five days before the date last set for the sale, to have this foreclosure proceeding dismissed and the Trust Deed reinstated by payment to the Beneficiary of the entire amount then due."

Lee again contacted CHL asserting that she was not in default on the loan. On or about January 9, 2008, she provided CHL with the essentially same documents she had sent prior to the Loan Modification Agreement, arguing that she had made her mortgage payments and was not in default. CHL again reviewed the documents and again found no support for her claim.

The Subject Property was sold at the Trustee's sale on January 24, 2008.

## DISCUSSION

**I.    Breach of Contract Claim**

Lee first alleges a breach of contract claim against CHL. The terms of the contract are set forth in the Note, Deed of Trust, and Loan Modification Agreement. Under the terms of the Note, Lee promised to pay the loan back to CHL, with interest, every month. The Note was secured by a Deed of Trust in the Subject Property. The Deed of Trust contained a power of sale. The terms of the Note and Deed of Trust were later incorporated into the Loan Modification Agreement. A breach of the Loan Modification Agreement and Note gave CHL

the right to initiate foreclosure proceedings and to seek the sale of the Subject Property at a trustee's sale.

Lee alleges that CHL breached the contract by conducting the January 2008 foreclosure sale even though "all funds due [CHL] were paid." Complaint, ¶ 3. This allegation is premised on Lee's belief that she made all of her mortgage payments and was not in default. Thus, according to Lee, CHL defaulted on the loan when it initiated foreclosure proceedings. In addition, Lee argues that she was not personally served with notice of the foreclosure sale.

### A.      Default

To prove that she was not in default, Lee has submitted voluminous documents to show that CHL misallocated, misplaced or simply refused to recognize her mortgage payments. This court has thoroughly reviewed Lee's documents, carefully compared them to CHL's documents, and concludes, as has CHL, that Lee misinterprets the undisputed facts.

First, whether or not Lee was delinquent on the loan in 2005 and 2006, resulting in CHL's first foreclosure proceedings, is irrelevant. Rather than proceed with that foreclosure, CHL entered into the Loan Modification Agreement with Lee at the end of 2006. At that point, Lee was no longer considered in default. Instead, the issue is whether Lee defaulted on her loan after she entered into the Loan Modification Agreement.

Second, the undisputed evidence shows that shortly after the Loan Modification Agreement, Lee quickly defaulted on her loan by making only a partial payment of $850.00 in January 2007 and making no further payments. Thus, when CHL commenced foreclosure proceedings in September 2007, culminating in a sale of the Subject Property in January 2008, it acted consistently with its contractual rights under the Note, Deed of Trust, and the Loan

7 - OPINION AND ORDER

Modification Agreement. In short, the undisputed facts prove that CHL did not breach any contract with Lee.

### 1. Loan Modification Fees

Lee argues that CHL did not credit two checks she sent in late December 2006 and early 2007, totaling $2,052.12. However, these checks were not monthly loan payments. Instead, as conclusively shown by CHL's documents, CHL properly credited these checks as payment of $2,053.22. Payment of that sum by Lee was required as consideration for entering into the Loan Modification Agreement and, specifically, to pay for the fees CHL incurred related to the first scheduled foreclosure proceeding, cancellation of the foreclosure, and modification activities. Saucedo 1/22/09 Decl., ¶¶ 9, 13 & Ex. 1. CHL so informed Lee in its letter dated December 12, 2006. *Id*. Thus, CHL properly credited the two checks totaling $2,052.12 as payment of her loan modification fees, and not as a mortgage payment.

### 2. Escrow and Fee Payment

Lee also claims that she made payments after the loan modification in the sums of $3,968.62, $3,021.00, and $946.78. However, as shown by the undisputed documents, Lee did not send a check for $3,968.62 to CHL. Instead CHL wrote a check to itself for this amount.

As Lee was informed by CHL's letter dated December 12, 2006, that $3,021.84 would be added to escrow for the loan and the remainder of $946.78 would to go towards fees that were owed in connection with loan, for a total of $3,968.62. Saucedo 1/22/09 Decl., ¶¶ 10, 13 & Ex. 1. CHL added this amount to escrow because, at the time based on Lee's default, there was an outstanding escrow deficiency and insufficient funds in escrow to pay for future taxes and insurance. *Id* at ¶ 10. In order to pay these amounts, CHL wrote a check to itself to be credited

towards the loan in order to cover the escrow. *Id* at ¶¶ 10, 14, & Ex. 2. In short, CHL paid $3,021.84 into escrow at the time of the loan modification and $946.78 for fees that Lee owed. *Id* at ¶ 10; *see also* Saucedo 12/12/08 Decl. Ex. 6, p. 8. As CHL advised Lee, these payments were then added to the principal on the loan. Saucedo 1/22/09 Decl., Ex. 1. Accordingly, it is undisputed that Lee never made a payment in the amount of $3,968.62.

### 3. $850.00 Payment

Lee also appears to argue that she also made payments of $903.17 and $177.96 after the Loan Modification Agreement. According to both Lee's and CHL's documents, Lee made a payment of $850.00 by a check dated January 26, 2007. However, as fully explained by CHL, Lee seeks to convert this partial payment into a full monthly loan payment of $1,124.08, with $903.17 applied to principal and interest and $177.96 applied to escrow, by misreading CHL's transaction log. Saucedo 12/12/08 Decl., Ex. 6, p. 7; Saucedo 1/22/09 Decl., ¶ 11. The undisputed fact remains that Lee made no further mortgage payments after January 2007.

In sum, Lee has submitted no evidence to show that she made a single payment that CHL failed to recognize on its payment history ledger. Once the parties entered into the Loan Modification Agreement in December 2006, Lee once again defaulted on the loan in early 2007, entitling CHL to initiate a foreclosure action.

### B. Service of Notice of Sale

Lee also claims that CHL's foreclosure was improper because she was not personally served with the Trustee's Notice of Sale. Pursuant to ORS 86.740, the notice of sale "shall be served pursuant to ORCP 7D(2) and 7D(3) or mailed by both first class and certified mail with

return receipt requested" at least 120 days before the sale. ORCP 7D allows for personal service or service by mail, as well as other methods.

CHL has submitted evidence showing that it complied with Oregon law by personally serving Lee on September 18, 2007, more than 120 days before the foreclosure sale which took place on January 24, 2008. Saucedo 12/12/08 Decl., ¶ 38 & Ex. 14. That evidence is the Declaration of Willie Nyberg ("Nyberg"), Senior Deputy of the Clatsop County Sheriff's Department. Deputy Nyberg made two attempts to serve Lee before finding her at her home on September 18, 2007. Nyberg Decl., ¶¶ 1-3 & Exs. 1 & 2. He "clearly remember[s] serving" Lee because he "spent approximately 30-45 minutes with her, while she showed [him] documents and requested that [he] complete a report of the theft of mail from her mailbox." *Id* at ¶ 2.

Lee disputes Deputy Nyberg's recollection by arguing that she was not at her home in Gearhart, Oregon on September 18, 2007, but instead was in Myrtle Creek, Oregon. As proof, she has submitted a print-out of an electronic bank account transaction detail report. That report shows a transaction related to a merchant sales draft in the amount of $15.69 from Figaro's Pizza in Myrtle Creek, Oregon, dated September 18, 2007. But, according to Lee's bank statement from TLC Federal Credit Union ("TLC"), Lee used her TLC debit card at Figaro's Pizza on September 16, not September 18, 2007. Cokley Decl., ¶¶ 3 & Ex. 3. The September 18, 2007 date on Lee's bank account report is the date TLC processed the sales draft from Figaro's Pizza. Lee simply misinterprets the processing or posting date as the transaction date. Thus, the documents prove that Lee was in Figaro's Pizza on September 16, not September 18, 2007, as she asserts.

10 - OPINION AND ORDER

As further proof that Lee was in Gearhart, Oregon, on September 18, 2007, CHL has submitted a check Lee wrote to "Bud's" that same day. *Id*, ¶ 2 & Ex. 2. That check is endorsed by Roady Enterprises, Incorporated ("Roady, Inc."). *Id*. Roady, Inc. is the registrant for Bud's Campground and Grocery ("Bud's"). Engbloom 1/22/09 Decl., ¶ 2 & Ex. 1. The address for Roady, Inc.'s principal place of business is listed as 4412 Highway 101 North, Gearhart, Oregon, 97138, the same address as Bud's. *Id* at ¶ 3 & Ex. 2. Lee's September 18, 2007 check to Bud's places her in Gearhart on that same date.

Thus, Lee is mistaken that she was at Figaro's Pizza in Myrtle Creek on September 18, 2007. Instead, the undisputed evidence places her in Gearhart, Oregon on September 18, 2007, when Deputy Nyberg served her. These undisputed facts prove that CHL effected personal service on Lee on September 18, 2007.

### C. Conclusion

Based on Lee's default, CHL was within its rights when it invoked foreclosure under the Note, Deed of Trust, and Loan Modification Agreement. In addition, CHL personally served Lee with the Trustee's Notice of Sale prior to the foreclosure sale. Therefore, CHL did not breach any contract and is entitled to summary judgment against Lee's breach of contract claim.

## II. Breach of Implied Contract Claim

Lee alleges a claim for breach of an implied contract based on CHL's alleged promise, through its "words to and conduct toward" her to "investigate there [*sic*] failures." Complaint, ¶ 9.

In Oregon, an implied contract is "inferred, in whole or in part, from [the parties'] conduct." *Staley v. Taylor*, 165 Or App 256, 262, 994 P2d 1220, 1224 (2000). "A contract

11 - OPINION AND ORDER

implied in fact can arise 'where the natural and just interpretation of the acts of the parties warrants such a conclusion.'" *Jaqua v. Nike, Inc.*, 125 Or App 294, 297, 865 P2d 442, 445 (1993), quoting *Owen v. Bradley*, 231 Or 94, 103, 371 P2d 166, 970 (1962).  However, "there cannot be a valid legally enforceable contract and an implied contract covering the same services." *Prestige Homes Real Estate, Co. v. Hanson*, 151 Or App 756, 762, 951 P2d 193, 195 (1997) (citations omitted).

Lee's breach of implied contract claim fails for the simple reason that, as noted above, there is no evidence of any failure by CHL.  To the contrary, CHL's actions were entirely lawful and consistent with the terms of its written agreements with Lee.  Furthermore, the mere fact that CHL listened to Lee's concerns and reviewed her documents does not give rise to an implied contract.  Instead, that conduct only shows that CHL acted consistently with the terms of its written agreements with Lee by making sure that she was in fact in default on her loan before commencing foreclosure proceedings.  CHL did not create a new implied contract.

Therefore, CHL is entitled to summary judgment against the claim for breach of an implied contract.

**III.    Breach of the Implied Covenant of Good Faith and Fair Dealing Claim**

Lee alleges that CHL breached the implied duty of good faith and fair dealing by engaging in conduct "incompatible with good faith and fair dealing" when it foreclosed on her loan.  Complaint, ¶ 10.

Oregon recognizes an implied duty of good faith and fair dealing in every contract in order to "effectuate the reasonable contractual expectations of the parties." *Uptown Heights Assoc. Ltd. Partnership v. Seafirst Corp.*, 320 Or 638, 645, 891 P2d 639, 643 (1995) (citation

omitted). To prove such a claim, a plaintiff must assert conduct by the defendant that violated the plaintiff's objectively reasonable contractual expectations. *Id.* Conduct consistent with the terms of the contract cannot serve as the basis of a claim of violation of the duty of good faith and fair dealing. *Id; see also U.S. Nat'l Bank of Oregon v. Boge*, 311 Or 550, 567, 814 P2d 1082, 1092 (1991) ("The obligation of good faith does not vary the substantive terms of the bargain."). An "implied covenant cannot contradict an express contractual term, or otherwise provide a remedy for an unpleasantly motivated act that is permitted expressly by the contract." *Zygar v. Johnson*, 169 Or App 638, 645, 10 P3d 326, 330 (2000), *rev denied*, 331 Or 584, 19 P3d 356 (2001) (citation omitted).

Here, Lee's claim for breach of the duty of good faith is based solely on CHL's foreclosure on the Subject Property. That foreclosure was entirely consistent with the express terms of the Deed of Trust based on Lee's default. Because CHL's conduct was consistent with the terms of the Deed of Trust, any claim based on the contractual duty of good faith and fair dealing fails as a matter of law.

Lee's claim also fails even if it is based on a tort theory of recovery. In order to assert a claim for tortious breach of a duty of good faith and fair dealing or for breach of fiduciary duty, a "plaintiff [i]s required to present evidence that a special relationship or fiduciary-type relationship exist[s] between the parties that [i]s independent of the duties under the [contract]." *Vanderselt v. Pope*, 155 Or App 334, 340, 963 P2d 130, 133, *rev denied*, 328 Or 194, 977 P2d 1172 (1998). A bank's "arm's-length, commercial relationship of creditor to debtor" is not such a special relationship. *Uptown Heights*, 320 Or at 650, 891 P2d at 646. As in *Uptown Heights*,

an arms-length debtor-creditor relationship is the kind of relationship that existed between Lee and CHL.

///

### IV. Intentional Infliction of Emotional Distress Claim

Lee also alleges a claim for Intentional Infliction of Emotional Distress ("IIED") based on CHL conducting a foreclosure sale "without an arguable basis" because "all funds due [CHL] were paid." Complaint, ¶¶ 3 & 5.

To state an IIED claim, a plaintiff must plead and prove that: "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *McGanty v. Staudenraus,* 321 Or 532, 543, 901 P2d 841,849 (1995), quoting *Sheets v. Knight,* 308 Or 220, 236, 779 P2d 1000, 1010 (1989). Lee cannot prove the first and third prongs of her IIED claim.

To satisfy the first element of intent, "[i]t is not enough that [the defendant] intentionally acted in a way that causes such distress." *Id* at 544, 901 P2d at 849, quoting *Patton v. J. C. Penney Co.*, 301 Or 117, 122, 719 P2d 854, 857 (1986*).* Here all Lee has shown is that CHL intentionally foreclosed on the Subject Property. Lee has submitted no evidence from which it can be reasonably inferred that by doing so, CHL desired to inflict emotional distress on her. As explained above, CHL's foreclosure was entirely consistent with the terms of its contractual agreements with her. Even if CHL wrongly determined that Lee was in default, there is no evidence that CHL desired to inflict severe emotional distress on Lee, as opposed to simply enforcing its contractual rights.

The third element of an IIED claim also is absent in this case. Socially intolerable conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." *Rockhill v. Pollard,* 259 Or 54, 59-60, 485 P2d 28, 31 (1971). Conduct that is merely "rude, boorish, tyrannical, churlish and mean" does not satisfy the high standard that the defendant's acts be an extraordinary transgression of the bounds of socially tolerable conduct. *Patton*, 301 Or at 124, 719 P2d at 858. "[C]onduct that is negligent, mistaken, or otherwise remiss rather than deliberate, intentional or engaged in by design will not support a claim for IIED." *Delaney v. Clifton*, 180 Or App 119, 137, 41 P3d 1099, 1110, *rev denied*, 334 Or 631, 54 P3d 1041 (2002).

Here, CHL did nothing that even comes close to the kind of "socially intolerable conduct" necessary to support an IIED claim. According to the undisputed facts, CHL foreclosed on the Subject Property only after Lee failed to make numerous mortgage payments. In fact, CHL postponed the first scheduled foreclosure sale several times in order to give Lee the opportunity to prove that she was not in default. CHL then agreed to a Loan Modification, providing Lee with yet another opportunity to stay current with her mortgage payments. Instead, Lee immediately defaulted again. After a year, CHL ultimately did foreclose on the Subject Property. That conduct is plainly not "socially intolerable," but demonstrates a diligent and good faith effort to work with Lee to avoid foreclosure.

Thus, CHL is entitled to summary judgment against Lee's IIED claim.

///

///

///

///

///

## **ORDER**

CHL's Motion for Summary Judgment (docket #23) is GRANTED as to all claims, and this action is dismissed.

DATED this 5th day of March 2009.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

16 - OPINION AND ORDER